3-12-14-82, IN RE ERIC JASINSKI Mr. Nye Is that how you pronounce it? N.G. Your Honor N.G. Yes, Your Honor Very pleased to call it My name is Anthony N.G. and I'm representing Dead Pallant International Business Machine Corporation a real party in interest The issue of this case is basically very simple It's whether the board have misapplied their interest when categorizing the phase verifying the accuracy of logical to physical mapping software statement of intended use And since this is a construction of claims and we asked the court to use de novo standard However, if the court decided to use the substantial evidence standard as suggested by the opposing counsel the pallant will not automatically lose because the board have committed several reversible errors in this particular case on law as well as facts So let me start with the facts of law In this particular case we just simply asked the court to uphold the holdings of Verringer which happened to be offered by Judge Kleminger also with us today The holding of this case is basically the preamble can be used in context unless there's no reason you have to take out as an intended use because it's basically put the claim in context and the board basically piggybacked that case with in re essential because that case is really victim talk about even though the statement of intended use can appear in the preamble but it can also appear in the body of the claims but really that case is a victim So for this case since the verifying the logical to physical mapping software is actually important and germane to this case if you take it out that's basically like the holding of Verringer which has no meaning except reduce it down to some sort of academic exercise Mr. NG, let's just assume for purposes of argument that we agree with you that the verifying the accuracy of said logical to physical mapping software is a limitation of the claim Yes, Your Honor As I understand the director, the director argues so what, Adams teaches that Correct Don't you have to convince us that the director is wrong when the director says that Adams actually teaches verifying the accuracy of this mapping software That's a good question, Your Honor Why doesn't Adams teach the method step of verifying the accuracy of the mapping software Yes, Your Honor Adams is also related to testing memory chips which is a case assigned also to international business machine so the parents well aware of Adams so basically Adams is related to testing memory software so when there's something wrong with the software the system memory basically we use what we call doing self-test, BIST short to send in some data to test this memory chip and then you read out the data and then you compare the expected data to see whether they're correct or not and then after that you take it to this what we call the logical to physical mapping software to print out this map so you can do the failure analysis if there's something wrong so you know exactly where the physical location of the software what's wrong so and in this case what distinguished from the Adams case is we want to find out what's wrong with this software if there's anything wrong with the software I'm not following you are you telling me that Adams teaches you in essence that there may be a flaw in the chip or there may be a flaw in the software but you don't know which? no your honor Adams teaches the testing of the memory chip so once you test the memory chip the result come out you cannot just read the result because it's illogical and dressed and then you have to use this software, this particular software logical to physical mapping software to read out the result but that software, the P software is prone to error so we have to test what's wrong with that software so this is a sequel to that case so it is completely distinguished why is the examiner wrong and this is your point I guess that one of ordinary skill in the art would deduce that the mapping software is defective if the Adams invention finds an error in the data why is that not correct? excuse me I don't understand your question the examiner as I understand it concluded that one of ordinary skill in the art would deduce that the mapping software is defective if the Adams invention finds an error in that data no in fact the examiner that's one of the mistake that the examiner did not understand that the invention is that the mapping software is not related to this particular case even though that's the mapping software that appears in both cases the Adams case and this case but the previous case the Adams case is really about testing the software I mean testing the system memory whether that's anything wrong with the memory and then the comparing step that mentioned in the record on Adams is really comparing is there anything wrong with the software I mean is there anything wrong with the system memory in Adams and once you get that result you translate to this mapping software to physical address so human being can read them Adams has mapping software mapping has mapping software and the problem is that the mapping software is prone to error that's why this invention is to address that mapping software to check whether the mapping software is correct or not but when Adams detects an error what do you know about the nature of the error sometimes you read the bit run and zero wrong like for example the mapping software is essentially translated no different let's say for example if I come to the court and say I know how to translate Chinese to English and your honor will say hold on so if there's a possibility that the error is in the mapping software but there's also a possibility that the error is for some other reason right that could be other reason but it's not addressed by the current or the previous or addressed by Adams so basically this current invention is addressed but when you run Adams what do you know at the end of the day you have the bits that build in self-test you know whether the system memory is correct or not that's because Adams is to test whether the system memory is correct or not by system memory you mean the accuracy of the chip correct so it's a hardware to test there has to be some way to test the hardware and Adams addressed the hardware to test whether anything wrong with the system memory and your application does what beyond that and then after you test the result as I mentioned is you have to use a translator to translate the result and otherwise you wouldn't know whether the test is correct or not so the translator which is this mapping software will translate the language to the human being and you can understand which bit is wrong and you get at that by having a certain number of predetermined fails that you just stick in and then you run your software to see if they find them correct if the software finds them then you say we have good software if the software doesn't find them you have bad software precisely your honor that's exactly what the current invention is about so and I think I can see why the board and the examiner confused the two because they are so similar and yet they are completely different because like your honor precisely point out the pre-series Adams is related to the system memory they are testing whether there is anything wrong with the hardware and then we use this piece of software to translate the results and this piece of software the mapping software cross over Adams as well as the present invention and that's where the confusion comes in because this invention is really addressed so what you are saying is that because you think Adams is not actually verifying the accuracy of the mapping software you could have an error in your software in Adams that would deduce or tell you that there is a flaw in the system correct but there was no flaw in the system at all it was that you were using the wrong testing mechanism correct and we would not know so if you use a measuring tape to measure whether Jack is taller than Jill you have to check whether the measuring tape is correct or not in this case the present invention is exactly what we are trying to do is to find a method to test this measuring tape so and I think to come back to the presiding judge's question because she was reading from I believe the examiner's final office action that was sustained by the board that said well it's true if you will that that your client's patent is more explicit in saying we are going to actually test and verify the accuracy of the software but one ordinary skill in the art when he runs Adam's will know if the error was in the software that will not because you have two unknowns one is the system chip itself because we are testing whether the system let's get at this I mean are you going to say your argument that there is the examiner was wrong that there is no substantial evidence in the record to support correct the conclusion that one of ordinary skill in the art would have had the answer that the flaw was in the mapping software excuse me John I mean what's the legal mistake here the legal the legal mistake is basically the board has incorrectly characterized the verifying step is simply a statement of intended use because first of all let's get past that let's say it is a limitation in the claim okay then then where what's the what's the mistake if I have to write the opinion up and say the both examiner and the board made a mistake yes what's what's the answer in Adams the the comparing step is let's say comparing apple to orange and then in the current invention the comparing step is comparing apple and bananas so the mistake is you compare the two as the same comparing steps and that's the mistake and that's because your test in your view you're testing two different things and Adams and in your you're correct your honor and in fact it's also on records doesn't that lead into the director's point that you didn't preserve that argument the comparing function is something that the director says you didn't raise below they say that you therefore waived it and in your reply brief you don't come back to that you in essence concede the point that is the director raised is related failure analysis and that point is actually first raised by the board by when when the board decided to use Behringer as the holding for this case and the evidence the support the board used is basically related to the  analysis that the board comment that the appellant did not address to that point but the point is the examiner never brought up that point and in fact the board that used as a support is really the argument that the appellant used the board to compare the differences or distinguish the differences between the two cases and yet the board decided to say this is basically look this is the support that our position this is the statement intended use because you are saying this is just for verifying and I think basically the board had legal error in the conclusion of law on this particular point and basically if that's any question that the judges have on this particular case I would reserve the remaining time for my rebuttal. Thank you. Thank you Mr. Ogee. Ms. Lateef. Thank you your honor. May it please the court I would like to touch on something that Judge Clovenger mentioned and that is the issues before this court are twofold at this point. One is whether or not the statement of intended use is, I'm sorry, whether or not the to verify phrase is a statement of intended use and the latter being if so whether or not Adams discloses it. And the main thing here is whether or not Adams disclosed it is focused primarily on the to verify phrase in the comparing step. All of the other parts of the comparing step have been waived and are not at issue here. So when the board and the examiner point to A36 and talk about failure analysis what they're basically saying is that you're testing the memory device and when you look at the memory testing software. Equally so it could be that it's not. That is correct. So that reference anticipates a claim that tells you for sure that the error was in the mapping and the software. That's correct, Your Honor. What does the inherency doctrine require? Could be enough under the inherency doctrine? Could be is not enough under inherency but I wouldn't argue that this reference deals with inherency. Inherency requires a must. It must be in the reference. Well, actually for anticipation every element must be in the reference, right? Well, but the fact that here in Adams it could be a failure would be enough for anticipation. Where in Adams does it explain that the failure could possibly be in the accuracy of the logic to physical mapping software? Adams doesn't explain what the multitude of failures can be. It doesn't. And how does it disclose it? Because it doesn't  the complexity of failure. And we know based on Jasinski's own application in the prior art there are multiple ways to test memory devices. And when you find that there's some sort of problem between the simulated data and the data that shows up. And you look at that, you get an error. If you would open up the memory device and see that there's actually not an error, one of the possible conclusions could be there's a problem with the mapping software. Isn't the purpose of both of these inventions to find out if there's something wrong and fix it if it is wrong. You don't want to keep manufacturing chips that aren't any good. So in Adams, the little light goes blinking, there's a failure in here, there's a problem. You just told me a minute ago that one of our engineers would look at the chip and they would figure out, okay, well, I see that there's not an actual problem in the chip. So what else could possibly be  One of those things that could be wrong. So if it doesn't say it explicitly and if it's not inherent, like you said it wasn't an actual       don't think that it is. I think that  a mental step. It's the next thing that you conclude. I would argue you don't need to get to the next step. It's not an active step that someone is doing. If you believe that it's a 103 reference, then the examiner found it to be anticipatory. I would say that one of the things you could do is remand it back and instruct them in a way that they could figure out what your concerns are. But I think what does that mean? Do we not do another analysis if we reject the anticipatory? And if you provided the board with what your concerns were. We don't do the board's job for them. We don't say but try these other three. I also believe that if you do find it limiting, that it is disclosed in Adams when Adams describes failure analysis. When you look at the data and compare it and find a problem and look into the memory device and see there's not actually a problem there. But when you said a minute earlier what you do when the Adams light started flashing, mistake, error, problem, he could somehow figure out that it was a flaw in the mechanical aspect of the chip. How does he do that? Well, he would look at the where there was, so it has a mapping software that gives you locations of where there's a problem. And so it tells you exactly where the problems are, two, three, four, something like that. And he would, it takes pictures of the chip and he can actually look at the chip itself and figure out whether or not the problems are where the mapping software said the problems are. And if they don't match and that's incorrect, then one would deduce, okay, there's not a problem with the chip, there must be something else going on here. Does it necessarily in electronic have to be the mapping software? Is there another possibility, is there too much humidity in the room or there's some other problem in manufacturing? It does not have to be the mapping software. It doesn't have to, so it's a real maybe. It's a possible problem with the mapping software. That's correct. And on the other hand, Jasinski tells you for sure that it's in the software. Jasinski uses its testing device by putting software errors in and then hunting to see if it finds it. It's testing the accuracy of the mapping software. Jasinski has a mental step at the end that tests the accuracy of the software, yes. But we would argue that's not a limitation within the question. Let me assume you're wrong on that. It would seem to me that Jasinski is doing something that Adams couldn't do. Adams made you guess. Adams gave you a coin and said flip it and maybe even if it has two sides you're not even sure that the mapping software side is accurate. I'm sorry that the mapping software is defective. If the memory chip proves not to have a failure, the number of things that could be wrong with the memory chip aren't necessarily infinite. If I could, I would like to talk about intended use. The agency's position with intended use is that the to verify phrase actually is not a limiting, does not have patentable weight. One of the cases that Jasinski cites is Bowinger. In that case, the court found that it was a limitation and that when you took the phrase out of the claim, the claim lacked utility. Ms. Lateef, if I said I was going to compare you and Mr. NG and then I stopped, you would have no idea what the basis, what the characteristics I was comparing was. So why doesn't this actually really matter because this limitation as expressed in D actually tells you what you're comparing them for. I'm comparing you for height, for volume, for eyesight, whatever. But it gives you the basis of the comparison. It doesn't matter when you're looking at whether or not Adams anticipates or whether it's anticipated by Adams  Ms. Lateef, you were just arguing it's not a claim limitation, it's a statement of intended use. I don't want to talk about what Adams has in it. What I want to talk about is how do I look at a claim versus a limitation that has to be present. You look at what the steps are and you look at whether or not if you were to remove the phrase that's in question, whether or not the claim still has utility. And in this particular instance, if you were to remove the to verify phrase, the claim still is a claim for testing a memory device. It still has steps that have no ambiguity. It still has steps that are... But again, I could say compare the two of you. But if I don't tell you the basis upon which I want to compare you, then you might come up with a list. You're right. You might say, oh, compare the two of us. My hair is longer than his hair, and he's taller than I am. But I was actually worrying about who wore glasses and who didn't. Do you follow what I'm saying? I follow what you're saying, but my response would be that there are still steps for which to compare us. There are still steps within the claim that you're proposing. I understand that you're saying, well, we don't know why we're doing it, but we have a series of steps that are telling us what we're supposed to do. But this is a limitation. It's in the claim language. It's not just in the preamble. And so you'd like us to read it out of the claim language entirely, and it just doesn't seem superfluous to me. It seems to me to give the exact basis for the physical comparison that's supposed to take place. Well, when you look at what the case law is in terms of whether or not a statement of intended use is a limitation or not, some of the factors that are looked at is whether or not if you were to remove the statement, if you are able to complete the steps in the exact same way, if there is ambiguity in those steps, if the claim loses utility, if there is a way in which removing the steps somehow makes some sort of difference,  is a way in which removing a memory device has utility, the to verify phrase does nothing to inform a person of how to execute the comparing steps. It doesn't change any of the steps in any way. It's essentially this mental step tacked on at the end to verify. How does an instructor verify the accuracy? It's not actively recited. Sure you do. Make sure what's in this one place is the same thing in this other place. That's how you verify. Maybe the difference is make sure they correspond exactly to what's present in each location. That's how you verify. I say verify this is my signature by comparing it to another signature of mine. I'm not sure what the question is, Your Honor. I apologize. No, that's all right. I guess I am sort of a little bit baffled about how you can say it doesn't have meaning. It's irrelevant in this claim. I feel like it gives the context for the comparison. Without it, I feel like you don't know why you're comparing two things. Again, I don't want to Is the claim definite without verifying the accuracy? It's a comparison with previous It's comparing basically simulated fails with actual fails.    I wanted to address what you were saying about whether or not I'm sorry, the question was whether or not there was an active step and you were saying someone could know how to verify because it's in the specification. When I read this claim, I think of the to verify step as the mental step you do at the end. You perform all of these steps and then at the end you say based on whatever your result is, okay, the mapping software is good or the mapping software is bad. And it is for that reason that it shouldn't be given patentable rights. It's not something you're actively doing. Any final thoughts? Although the argument is that the entirety of the genius of the invention is to be able to tell you whether to verify whether or not your software is any good. Your adversary is putting up two very distinct inventions. Adam's is one invention, his is another. Well, Adam's, again, I go back to Adam's can do that. When Adam cites that you can use this map for use in Chile. You told me you could be wrong. Sure, somebody can use Adams to try to decide if the software was no good.  not  simple. The idea is that the size of the Grand Canyon is measured by the verification step. I would respectfully disagree with that. I would argue that the language for use in failure analysis while it can be something else, it can also be this. We're dealing with an anticipation rejection here. On the anticipation rejection, I would have expected you to say every time you run Adam's, you will know for sure. He'll say the flaw was at point A on the chip. There's no flaw on point A on the chip. It has to be the software. You gave that argument up. I'm arguing that it's not. I'm not arguing inherency. I believe that language that the examiner points to is enough to set it up. I'm arguing that  Adam's is something that can be deduced, it's in the specification of Adam's. I'd like to add if I could, that the council didn't bring up claim eight. We'd like to rest on the brief. If there are no further questions, I'll yield my time. Thank you. Mr. M. G. We'll give you three minutes for rebuttal if you need it. May it please the court. The reason why the panel is here before this